UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
Urbana Division

| | |
|---|---|
| CLAUDIA K. COULTAS, | ) |
|         Plaintiff, | ) |
| v. | ) |
| | ) |
| COMMISSIONER OF SOCIAL | )  Case No. 05-2205 |
| SECURITY, sued as Jo Anne B. Barnhart, | ) |
| Commissioner of Social Security, | ) |
| | ) |
|         Defendant. | ) |

## REPORT AND RECOMMENDATION

In March 2005, Administrative Law Judge Barbara Welsh (hereinafter "ALJ") denied social security disability insurance benefits (hereinafter "DIB") to Plaintiff Claudia K. Coultas. The ALJ based her decision on findings that although Plaintiff suffered from severe impairments, she retained the capability of performing past relevant work, and she was also capable of performing a significant number of jobs available in the economy.

In September 2005, Plaintiff filed a Complaint (#1) against Defendant Jo Anne Barnhart, the Commissioner of Social Security, seeking judicial review of the final decision by the Commissioner of Social Security Administration (hereinafter "SSA") denying DIB. In May 2006, Plaintiff filed a Motion for Summary Judgment (#9), and in July 2006, Defendant filed a Motion for an Order Which Affirms the Secretary's Decision (#11). After reviewing the administrative record and the parties' memoranda, this Court recommends, pursuant to its authority under 28 U.S.C. § 636(b)(1)(B), that Defendant's Motion for an Order Which Affirms the Secretary's Decision **(#11)** be **GRANTED**.

### I.  Background
### A.  Procedural Background

Plaintiff originally filed her claim for DIB in October 2002 alleging disability as of April 1, 2002, based on degenerative joint disease. (R. 27.) The SSA denied Plaintiff's application in December 2002, and again upon reconsideration in May 2003. Plaintiff appealed

and the ALJ held a hearing in February 2005. In March 2005, the ALJ denied Plaintiff's application for DIB based on findings that Plaintiff was not disabled within the meaning of the Social Security Act and that she was capable of performing her past relevant work as well as other work available in the economy. In July 2005, the Appeals Council denied Plaintiff's request for review, and Plaintiff subsequently appealed the decision to this Court under 42 U.S.C. § 405(g).

### B. Plaintiff's Medical Background

The record contains evidence pertinent both to Plaintiff's physical and mental impairments. Plaintiff, however, raises no error relevant to the ALJ's analysis or conclusions regarding Plaintiff's mental impairments. This discussion of the relevant medical background, therefore, will focus exclusively on the medical evidence as it relates to Plaintiff's physical impairments.

In November 2000, Plaintiff consulted Dr. Sreeman Prathipati complaining that she had experienced severe neck pain during the preceding two months. She reported at that time that she had received chiropractic treatment for her back pain. (R. 108.) Plaintiff underwent magnetic resonance imaging (hereinafter "MRI") of her cervical spine, the results of which were normal. (R. 107.) In January 2001, Plaintiff consulted Dr. Prathipati complaining of neck pain radiating to the interscapular area. Dr. Prathipati noted her complaint of pain, and opined that an MRI done at the time was normal. (R. 105.)

In April 2001, Plaintiff first consulted treating physician Dr. William Hensold. Plaintiff complained of back pain, and Dr. Hensold twice during 2001 diagnosed Plaintiff with degenerative joint disease. Later in 2001, Plaintiff complained to Dr. Hensold of pain in her elbows and right hand. Arthritis panels performed at Dr. Henshold's request produced normal findings, and Dr. Hensold prescribed Celebrex and Flexeril to treat Plaintiff's symptoms. (R. 132A.)

Plaintiff consulted Dr. Hensold in April 2002 complaining primarily of pain in one leg, both hands and shoulders, her neck, and her rear dorsal spine area. Dr. Hensold diagnosed Plaintiff with "probable inflammatory arthritis cause unknown" and later with gouty arthritis. (R. 130.) A series of arthritis panels produced normal results, except for an elevated level of uric acid. An MRI of Plaintiff's spine done in April 2002 showed mild compression deformities of T8 and T9, and a mild degree of osteoarthritis of the cervical spine at C3, C4, and C5. (R. 112-13.)

In October 2002, Plaintiff again met with Dr. Hensold, this time complaining of "a lot of distress," and further complaining of stiffness in her fingers. (R. 128.) Dr. Hensold again noted that tests had produced normal findings, and diagnosed Plaintiff with "generalized arthritis cause unknown suggestive of gout or pseudogout." (R. 128.)

In November 2002, Dr. Hensold responded to an inquiry from the Illinois Department of Human Services (hereinafter "DHS") regarding Plaintiff's October 2002 office visit. DHS inquired regarding Plaintiff's complaint of stiffness in her fingers, and Dr. Hensold responded that Plaintiff's ability to oppose thumb to finger in each hand was 50%; her ability to perform fine and gross manipulations with each hand was 50%; her grip strength was 2/5 with the right hand and 3/5 with the left hand; and Plaintiff's range of motion in her fingers was 50%. (R. 124-26.) Dr. Hensold's treatment notes from Plaintiff's October 2002 office visit contain no reference to any tests or objective findings regarding Plaintiff's grip or manipulative abilities aside from the arthritis panels noted above. (R. 128.)

In December 2002, Dr. James Graham completed a Residual Functional Capacity (hereinafter "RFC") Assessment of Plaintiff based on the medical records discussed above. Dr. Graham concluded that Plaintiff's exertional limitations included occasionally lifting weights of twenty pounds, frequently lifting weights of ten pounds, and sitting and/or walking for a total of about six hours in an eight-hour work day. (R. 137.) He further concluded that Plaintiff had manipulative limitations of handling and fingering. Notably, Dr. Graham's description of

Plaintiff's manipulative limitations mirrors precisely Dr. Hensold's responses to the November 2002 DHS questionnaire. (R. 139.)

In February 2003, at the request of the Illinois Bureau of Disability Determination Services, Plaintiff consulted Dr. George Gindi. After a thorough physical examination, Dr. Gindi noted that Plaintiff had no joint deformities. Dr. Gindi noted swelling and tenderness of the third and fouth metacarpal phalangeal joints in both hands, but concluded that Plaintiff's range of movement in her hands was normal though painful. Dr. Gindi further found that Plaintiff's grip strength was equal bilaterally and was 5/5. (R. 147.) With regard to Plaintiff's back, Dr. Gindi noted some tenderness and muscle spasm in the lumbosacral area, but otherwise found no anatomic abnormality of the spine and no limitation of movement of any spinal segment. (R. 147.) An x-ray performed on the right hand showed a "suggestion of old trauma involving the 5th metacarpal bone" that needed to be clinically correlated but was otherwise unremarkable. (R. 149.) Dr. Gindi's diagnosis included arthritis of the hand, head and back; possible rheumatoid arthritis; and osteoarthritis of the spine. (R. 148.)

Plaintiff also continued to see Dr. Hensold during 2003. In February, she presented with no new complaints, but Plaintiff reported that the weather seemed to increase her pain and that she had trouble sleeping. Dr. Hensold once again diagnosed gouty arthritis. In July, Plaintiff complained of increased shoulder pain, and Dr. Hensold noted that her pain lately had "strictly been in the neck and it is questionable also whether she might be having more difficulty in the lower thoracic and lumbar region." (R. 181.) Dr. Hensold also noted that an arthritic panel showed no indication of rheumatoid disease or of lupus factors. In July, Dr. Hensold diagnosed gouty arthritis, degenerative joint disease, and possible osteopenia. (R. 181.) There was no mention in Dr. Hensold's treatment notes on either occasion of Plaintiff's hand or finger problems.

In May 2003, Dr. Henry Rohs performed another RFC Assessment based on Plaintiff's updated medical record, including Dr. Gindi's evaluation. Dr. Rohs' conclusions as to Plaintiff's exertional limitations mirrored those of the December 2002 RFC assessment by Dr. Graham.

(R. 169, 137.)  Dr. Rohs' assessment of Plaintiff's manipulative limitations, however, differed sharply from those of Dr. Graham.  Dr. Rohs concluded that Plaintiff was unlimited with respect to both handling and fingering.  Regarding manipulative limitations, Dr. Rohs noted only that Plaintiff was limited by pain when reaching above her shoulders.  (R. 171.)

Between September and November 2004, Plaintiff consulted with Dr. Donald McAskill, a chiropractor.  At the end of this period, Dr. McAskill concluded that Plaintiff suffered from lumbar disc protrusion, right hip tendinitis, right sciatic radiculitis, and cervical degenerative joint disease.  Dr. McAskill's conclusions were supported by his extensive office examinations and an MRI taken in October 2004, which showed diffuse bulging discs at L2-3, L3-4, and L5-S1.  (R. 187.)

Two items were appended to the record after the February 2005 hearing.  The first is a January 2005 x-ray ordered by Dr. McAskill showing a disc extrusion present at C6-7.  (R. 222.)  The second is a report made in January 2005 by Dr. James Harms at the Carle Spine Institute for Dr. McAskill.  Dr. Harms indicated that he had examined the patient and had examined her recent MRI as well.  He concluded that Plaintiff had a herniated disc at C6-7.  He noted that this sort of problem generally resolves itself within six to twelve weeks and that he believed Plaintiff would "get better on her own."  (R. 225.)  Dr. Harms recommended symptomatic treatment such as heat, ice, massage, and physical therapy to deal with the pain in the meantime.  Dr. Harms noted no other problems.

### C.  The Hearing Before the ALJ

In February 2005, the ALJ held a hearing at which Plaintiff and Ms. Jennie Chin, a vocational expert (hereinafter "VE"), each testified.

Plaintiff testified that she had helped her husband build a recycling business for twenty years, but that she had been forced to stop work in March 2002 because she was physically unable to continue.  (R. 239.)  Plaintiff further testified that in the year or year and a half prior to stopping work she had been limited to office work, namely to payroll, daily bookkeeping,

accounts receivable, accounts payable, and cashier duties. (R. 238, 240.) She testified that the physical pain and the effects of the medication kept her from working. (R. 241.) Plaintiff also stated that she spent most of her time in bed, that a neighbor and her husband helped her maintain her home on a daily basis, and that she had not been out of the house often although she had made a week-long automobile trip to Phoenix, Arizona, to visit her sister over the Christmas holiday. (R. 242-47.) Plaintiff later noted that her neighbor began providing significant help in the fall of 2004. (R. 252.)

In questioning the VE, the ALJ posed the hypothetical situation of an individual with Plaintiff's educational and work history who was limited to light and sedentary work and further limited to no jobs requiring more than occasional bending or stooping, no jobs requiring over shoulder work, and no jobs requiring climbing or work at unprotected heights. The VE replied that all of Plaintiff's past relevant work as a bookkeeper, cashier, and receptionist could be done within these limitations. (R. 253.)

The ALJ then asked the VE to consider what jobs would be available to an individual with these limitations who was further limited to unskilled, entry-level work that is routine and repetitive in nature. The VE replied that the jobs of assembler, packager, general office clerk, and unskilled receptionist all would be available to such a person, and the VE testified that these jobs were available in the State of Illinois in significant numbers. (R. 254.) The VE further stated that her testimony was consistent with the Dictionary of Occupational Titles (hereinafter "DOT"). (R. 254.)

Plaintiff's counsel then questioned the VE, inquiring what the effect on the available jobs would be if the hypothetical individual were only occasionally able to perform handling and fingering functions. The VE testified that all of the identified jobs required constant fingering and handling of objects. (R. 255-56.)

### D. The ALJ's Report and Decision

In determining whether a claimant is disabled within the meaning of the Social Security Act, the ALJ must proceed through a five-step analysis. 20 C.F.R. § 416.920(a)-(f). The Commissioner must determine in sequence: (1) whether the claimant is currently employed (or was during the relevant period); (2) whether she had a severe impairment; (3) whether the impairment met or equaled one listed by the Commissioner; (4) whether the claimant could have performed her past work; and (5) whether the claimant was capable of performing any work in the national economy. *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992). Once the claimant has satisfied the first two steps, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have a listed impairment, but cannot perform her past work, the burden shifts to the Commissioner to show that the claimant can perform some other job. *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995).

In this case, the ALJ first found that Plaintiff had done some work during the relevant period, but had not been employed or done any substantial gainful activity. (R. 13.) The ALJ next found that Plaintiff suffers from severe impairments, including both mental and physical impairments, but that none of the impairments nor any combination of them was medically equivalent to any of those listed by the Commissioner at 20 C.F.R. Part 404, Subpart P, Appendix I. (R. 16.) Turning to the step-four inquiry, the ALJ reviewed Plaintiff's medical record and the testimony of Plaintiff and Plaintiff's husband and determined that Plaintiff retained the RFC to perform the requirements of light and sedentary work. The ALJ further determined that Plaintiff had the following physical non-exertional limitations: She could not (1) perform any climbing due to joint pain; (2) reach above shoulder level due to neck and shoulder pain; (3) work at unprotected heights due to medication side effects; or (4) do more than occasional stooping and bending due to back pain. (R. 18.) Relying on the VE's testimony, the ALJ found that Plaintiff, given these limitations, did retain the ability to perform her past relevant work. (R. 19.) Finally, although a step-five inquiry was not necessary, the ALJ stated that even were Plaintiff further limited to sedentary, routine, and repetitive work and therefore not capable of performing her past relevant work, she would not be found disabled because she was able to perform a significant number of jobs available in the economy. (R. 20.)

### III. Standard of Review

In reviewing an ALJ's decision, this Court does not try the case *de novo* or replace the ALJ's finding with the Court's own assessment of the evidence. *Pugh v. Bowen*, 870 F.2d 1271, 1274 (7th Cir. 1989). The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, are conclusive. 42 U.S.C. § 405(g). Thus, the question before the Court is not whether Plaintiff is, in fact, disabled, but whether the evidence substantially supports the ALJ's findings. *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995). The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether Plaintiff is disabled, the Court must affirm the ALJ's decision denying benefits. *Brooks v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996).

Where an ALJ's credibility determination is at issue, the Court gives considerable deference to the ALJ's findings and will not overturn them unless the plaintiff can show that those findings are patently wrong. *Urban v. Sullivan*, 799 F. Supp. 908, 911 (C.D. Ill. 1992); *Kelley v. Sullivan*, 890 F.2d 961, 965 (7th Cir. 1989). However, when a credibility determination rests on objective factors or fundamental implausibilities rather than subjective considerations, reviewing courts have more freedom to review the ALJ's credibility determination. *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994).

### IV. Analysis

Plaintiff argues that the ALJ's decision should be reversed on four grounds: (1) the ALJ's refusal to give controlling weight to the opinion of treating physician Dr. Hensold regarding functional limitations from Plaintiff's hand impairment was not supported by substantial evidence; (2) the ALJ's credibility determination was not supported by substantial evidence; (3) the ALJ's determination as to Plaintiff's RFC was insufficient; and (4) the ALJ erred by failing to identify and resolve inconsistencies between the VE's testimony and the DOT.

**A.  The ALJ's Refusal To Give Controlling Weight to Dr. Hensold's Opinions**

Plaintiff first argues that the ALJ's refusal to give controlling weight to the opinion of treating physician Dr. Hensold regarding the functional limitations "flowing from [Plaintiff]'s hand impairment" was not supported by substantial evidence.  (Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment, #9-2, p. 11.)  Plaintiff contends that the ALJ's erroneous decision resulted in a finding by the ALJ as to Plaintiff's RFC that ignored manipulative limitations that were well supported in the medical record.  (#9-2, pp. 11-12.)

SSA regulations state that in making a finding as to a claimant's alleged impairments, an ALJ will defer to the medical opinion of a treating physician when the ALJ finds "that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case." 20 C.F.R. § 404.1527(d)(2).

Courts will uphold an ALJ's determination not to give controlling weight to the medical opinion of a treating source when that determination is based on a thorough consideration of all relevant medical evidence on the record and where the ALJ identifies and explains the sufficiency of any inconsistent or contradictory medical evidence on which the ALJ relies in rejecting the treating source's opinion.  *See Boiles v. Barnhart*, 395 F.3d 421, 425-27 (7th Cir. 2005) (remanding where ALJ's rejection of the treating physicians opinion "did not explain how other evidence in the record contradicted [the treating source]'s opinion"); *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004) (remanding where ALJ explained his reasons for rejecting treating source's opinion, but where that explanation ignored or misconstrued significant parts of the medical record); *Johansen v. Barnhart*, 314 F.3d 283, 287-88 (7th Cir. 2002) (holding that ALJ's refusal to give controlling weight was proper where the ALJ properly identified inconsistent medical evidence and adequately discussed his reasons for relying on the inconsistent evidence).

Here, the ALJ determined that Dr. Hensold's evidence with regard to Plaintiff's hand impairments failed to satisfy either of the two requirements of 20 C.F.R. § 404.1527(d)(2).  The ALJ recognized that Dr. Hensold's reply to the DHS inquiry regarding the October 15, 2002, examination of Plaintiff was effectively an evaluation of Plaintiff's manipulative limitations. (R. 18.)  The ALJ found, however, that Dr. Hensold's conclusions failed to meet the first controlling-weight requirement because they were not supported by Dr. Hensold's own treatment notes.  Specifically, the ALJ concluded that the record evinced "no indication that Dr. Hensold actually tested [Plaintiff]'s grip strength, etc., and no medical reason is noted by Dr. Hensold which would cause this level of limitation . . . ."  (R. 19.)

This Court's review of the medical record produced no grounds on which to question the ALJ's determination.  Dr. Hensold's treatment notes make regular note of Plaintiff's complaints of pain in her hands and fingers, and Dr. Hensold diagnosed Plaintiff with arthritis, including gouty arthritis, on at least three occasions.  (R. 128, 130.)  The ALJ, however, did not conclude that Dr. Hensold's evaluation was incorrect, but found instead that nothing in Dr. Hensold's treatment notes, including those from the October 15 examination, indicated that Dr. Hensold ever tested Plaintiff's manipulative abilities.  This is the critical question under the first prong of the regulation:  The regulations require that the opinion be supported "by medically acceptable clinical and laboratory diagnostic techniques."  20 C.F.R. § 404.1527(d)(2).  The ALJ was therefore justified in finding that these estimations by a treating physician did not constitute medically-acceptable clinical or laboratory diagnostic techniques.

The ALJ also concluded that Dr. Gindi's February 2003 report contradicted Dr. Hensold's conclusions.  (R. 19.)  Dr. Gindi performed a full examination of Plaintiff and concluded that Plaintiff had a grip strength of 5/5.  (R. 147.)  Based on this contrary finding by an examining physician, the Court cannot conclude that the ALJ erred by failing to give controlling weight to Dr. Hensold's opinion.

This Court notes that it need not consider which of these inconsistent medical reports is more correct or plausible.  So long as, in light of all the evidence, reasonable minds could differ

concerning whether Plaintiff is disabled, the Court must affirm the ALJ's decision. *Brooks*, 91 F.3d at 977-78. That is clearly the case here, and this Court cannot conclude that the ALJ erred by refusing to give controlling weight to Dr. Hensold's opinions regarding Plaintiff's manipulative limitations.

### B. The ALJ's Credibility Determination

Plaintiff next argues that substantial evidence fails to support the ALJ's conclusion that Plaintiff's testimony regarding the severity of her symptoms lacked credibility.

The ALJ based her credibility determination on objective factors. The ALJ recognized that Plaintiff alleged that her physical limitations were debilitating, but found that the objective medical evidence on the record demonstrated "mostly normal or mildly abnormal findings." (R. 18.) The ALJ also recognized Plaintiff's claims that the medications helped to relieve her pain. She noted that although Plaintiff at times experienced more severe pain, the record indicated that she received only conservative treatment such as medication and chiropractic treatment. The ALJ finally stated that although her doctors diagnosed her with inflammatory joint disease and, later, degenerative joint disease, the objective tests conducted for each indicated largely unremarkable clinical findings. (R. 18.)

The Court recognizes that where, as here, an ALJ bases her credibility determination on objective factors, the Court has greater freedom to review the ALJ's conclusions. *Herron*, 19 F.3d at 335. The SSA has addressed the requirements that an ALJ must meet in any credibility determination in Social Security Ruling (hereinafter "SSR") 96-7p. This ruling states, in pertinent part, that "[w]hen evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements." SSR 96-7p. Controlling precedent makes it clear that the ALJ must adequately explain her reasons based on a thorough investigation of the evidence. *See Golembiewski v. Barnhart*, 322 F.3d 912, 915-16 (7th Cir. 2003) (holding that the ALJ's credibility determination was improper where the ALJ failed to specifically discuss any grounds for finding the plaintiff's testimony unbelievable); *Zurawaski v. Halter*, 245 F.3d 881, 887-88

(7th Cir. 2001) (holding credibility determination inadequate where the ALJ's reasoning "offers no clue as to whether she *examined* the full range of medical evidence as it relates to [the plaintiff's] claim") (emphasis in the original).

Here, the ALJ's decision and her explanation of the grounds on which she found Plaintiff's testimony to lack full credibility are sufficient. Plaintiff's argument that the ALJ improperly relied upon her findings as to Plaintiff's daily activities is unpersuasive. The ALJ only mentions Plaintiff's daily activities in the step-three consideration of Plaintiff's mental impairments, and that discussion is wholly without connection to the ALJ's logic with regard to Plaintiff's credibility. (R. 14.)

Plaintiff next argues that the ALJ failed to mention key parts of the medical evidence in her rationale, raising particularly four X-ray or MRI tests that Plaintiff claims that the ALJ ignored. A review of the ALJ's decision, however, shows that the ALJ mentioned each of these tests, and others besides, and that the ALJ did use this evidence to arrive at an adequately supported conclusion as to Plaintiff's back and neck impairments. (R. 16-19.) Plaintiff then asserts that the ALJ's finding relied upon the mistaken assertion that objective evidence did not support Plaintiff's claims regarding her hands. The Court addressed the adequacy of the ALJ's conclusions relevant to this issue earlier and determined that the ALJ did not err by refusing to give controlling weight to Dr. Hensold's opinions regarding Plaintiffs manipulative limitations. That conclusion applies here as well.

Plaintiff finally argues that the ALJ failed to mention the observations of an SSA claims worker, who completed a field office disability report in which she observed that Plaintiff limped, moved as if in pain, and her fingers were red and beginning to be crooked. (R. 74.) Undoubtedly, the ALJ must consider all evidence presented and must not ignore entire lines of evidence to selectively discuss only the evidence supporting her conclusion. 20 C.F.R. § 404.1529(c)(3); *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). It is well established, however, that the ALJ is under no obligation to articulate her reasons for rejecting every piece of evidence. *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). Here, the ALJ's review of the

record and articulation of her reasons were clearly sufficient. Therefore, the ALJ did not err by failing to mention her reason for rejecting this piece of evidence.

### C. The Sufficiency of the ALJ's RFC and Hypothetical Question

Plaintiff next argues that the ALJ's finding as to Plaintiff's RFC was not based on substantial evidence. Therefore, Plaintiff contends, the ALJ posed an incomplete hypothetical question to the VE and was not justified in relying on the VE's response.

In making a finding as to a claimant's RFC, the ALJ must account for all substantial medical evidence on the record, and a hypothetical question posed to a VE is sufficient if it tracks the substantially-supported findings of the RFC. *Young v. Barnhart*, 362 F.3d 995, 1002-04 (7th Cir. 2004). Such a hypothetical question, moreover, is not made incomplete or insufficient simply because the ALJ does not mention claimant's complaints that lack medical support on the record. *See Cass v. Shalala*, 8 F.3d 552, 555-56 (7th Cir. 1993) (affirming the adequacy of the hypothetical question posed to the VE despite the fact that it did not include certain of claimant's complaints that lacked medical support on the record).

Here, Plaintiff's argument rests on her contention that the RFC, and thus the hypothetical question to the VE, were fatally flawed because the ALJ "failed to include the manipulative limitations which are well documented in the record." (#9-2, p. 22.) Plaintiff's position essentially draws a straight line between her first argument, that the ALJ improperly refused to give controlling weight to Dr. Hensold, and this argument. Tracing that line here, the Court relies upon its conclusion above that the ALJ's determination relative to Plaintiff's manipulative limitations was adequate. As a result, the Court concludes that both the ALJ's finding as to Plaintiff's RFC and the ALJ's hypothetical question are clearly supported by substantial evidence in this record.

Plaintiff additionally contends that the hypothetical question posed to the VE was flawed because the ALJ failed to recognize the limitations indicated in Dr. Rohs' May 2003 RFC assessment. The RFC and hypothetical question framed by the ALJ, however, mirror precisely

Dr. Rohs' assessment.  In completing the section on manipulative limitations in the RFC assessment form, Dr. Rohs checked the box indicating that Plaintiff's "reaching in all directions (including overhead)" was "limited."  (R. 171.)  Then, when asked to "describe how the activities checked 'limited' are impaired," Dr. Rohs responded that Plaintiff's reach was "[p]ainful with greater than 90 degrees abduction of the shoulders."  (R. 171.)  Thus, the ALJ correctly included the physical non-exertional limitation of "reaching above shoulder level" in Plaintiff's RFC and in the hypothetical question posed to the VE.

As such, the ALJ was justified in relying upon the VE's testimony in finding that Plaintiff retained the ability to perform past relevant work.

### D.  Conflict Between the VE's Testimony and the DOT

Plaintiff's final argument is that the VE's testimony regarding Plaintiff's past relevant work conflicted with the DOT.

SSR 00-4p clarifies an ALJ's obligation with regard to any conflict between a VE's testimony and the DOT occupational descriptions.  It reads in pertinent part that "before relying on VE . . . evidence to support a disability determination or decision, our adjudicators must: Identify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs . . . and information in the [DOT]."  SSR 00-4p.  Under this ruling, the ALJ satisfies his duty if the ALJ (1) asks the VE whether any conflict exists; and (2) obtains a reasonable explanation for and resolves any conflict that is identified.  *Id.*  Thus, where the ALJ does inquire, and no conflict is identified, the ALJ may rely on the testimony of the VE.  *See Donahue v. Barnhart*, 279 F.3d 441, 445-47 (7th Cir. 2002) (stating in dictum (because SSR 00-4p was promulgated subsequently and thus was not directly applicable) that where no conflict was identified at the hearing, the ALJ's reliance on the VE's testimony was proper, and the plaintiff was foreclosed from raising the conflict on appeal); *see also Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006) (stating that the *Donahue* court's logic was consistent with SSR 00-4p, and that the ALJ met her obligation where she inquired and no conflict was identified).

Here, the ALJ clearly fulfilled her obligations with respect to identifying any conflict. In her examination of the VE, the ALJ specifically questioned the VE as to whether her testimony was consistent with the DOT, and the VE responded that it was. (R. 254.) The SSR requires nothing more of the ALJ. Furthermore, consistent with *Donahue*, which provides the only direct discussion by the Seventh Circuit of an ALJ's duties under SSR 00-4p, this Court concludes that because the ALJ fulfilled her duties, and because Plaintiff failed to identify any potential conflicts at the hearing, Plaintiff may not now challenge the ALJ's determination by raising any alleged conflicts. Thus, the ALJ's reliance on the VE's testimony in concluding that Plaintiff retained the ability to perform relevant past work was proper.

## V.  Summary

For the reasons set forth above, this Court recommends Defendant's Motion for an Order Which Affirms the Secretary's Decision **(#11)** be **GRANTED**. The parties are advised that any objection to this recommendation must be filed in writing with the clerk within ten (10) working days after being served with a copy of this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1). Failure to object will constitute a waiver of objections on appeal. *Video Views, Inc. v. Studio 21, Ltd.*, 797 F.2d 538, 539 (7th Cir. 1986).

ENTER this 5th day of September, 2006.

s/ DAVID G. BERNTHAL  
U.S. MAGISTRATE JUDGE